# THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STACY SATTERWHITE, individually, and on behalf of her minor child, L.B., individually,<br><br>Appellant,<br><br>v.<br><br>BETHEL SCHOOL DISTRICT NO. 403,<br><br>Respondent. | No. 59753-5-II<br><br><br>UNPUBLISHED OPINION |

CHE, J. — Stacy Satterwhite, on behalf of herself and her minor daughter, LB, appeals a jury verdict finding Bethel School District (BSD) not liable for negligence.

In May 2021, LB transferred to Bethel Virtual Academy (BVA), a virtual school within the BSD. Eunissa Jackson, LB's older sister, worked at BVA as a teacher, but not as LB's teacher. LB frequently spent days and nights at Jackson's[1] apartment, where both Jackson and LB would work on LB's BVA assignments. LB spent time at Jackson's apartment through the summer, and into the fall, even after she transferred to a different school. Meanwhile, Jackson's fiancé, Ikeem Jackson, groomed, molested, and raped, LB. LB reported the abuse to Jackson multiple times, but Jackson never reported the abuse. Eventually, Ikeem pleaded guilty to rape of a child in the first degree, and Satterwhite filed this negligence lawsuit against BSD.

---

[1] We refer to Eunissa using the last name Jackson, instead of Satterwhite. At the time of these events, her last name was Satterwhite; however, in the interim, she married Ikeem Jackson and now carries the last name Jackson. We refer to Ikeem Jackson as Ikeem to distinguish Eunissa from Ikeem as they share the same last name.

At trial, the court allowed Satterwhite's expert witness, Dr. Dennis Smith, to testify that Jackson's actions in not reporting the suspected child abuse constituted acting outside the scope of her job responsibilities. The trial court also allowed BSD to question Dr. Smith about whether BSD's policies and trainings informed employees of the possible criminal consequences associated with failing to report suspected child abuse. Over Satterwhite's objection, the trial court gave jury instruction 18, which stated a mandatory reporter's duty to report suspected child abuse required some connection between the reporter's professional identity and the circumstances in which the reporter gained reasonable cause to believe the child had been abused. The jury found BSD not liable for negligence.

Satterwhite filed a CR 59 motion for a new trial based upon, among other grounds, alleged misconduct and misstatements of the law on the part of BSD. The trial court denied the motion.

On appeal, Satterwhite argues the trial court abused its discretion by providing the jury with instruction 18, the trial court abused its discretion by denying her CR 59 motion for a new trial, and the trial court erred in allowing Dr. Smith to testify to whether Jackson was acting within the scope of her job responsibilities when she failed to report the abuse.

We hold that even if the trial court abused its discretion by giving jury instruction 18, doing so was harmless. We further hold the trial court did not abuse its discretion by denying Satterwhite's CR 59 motion, and did not err in allowing Dr. Smith to testify to whether Jackson was acting within the scope of her job responsibilities when she failed to report the abuse.

Accordingly, we affirm.

2

FACTS

I. BACKGROUND

In May 2021, LB, a fifth grader, transferred to BVA, a virtual and online school, which operated as part of the BSD. LB's older sister, Jackson, encouraged their mother, Satterwhite, to transfer LB to BVA. At that time, Jackson worked as a teacher for BVA.

Jackson worked remotely from her apartment. Jackson's apartment was set up like a classroom, with learning materials available to LB. However, Jackson was not LB's assigned classroom teacher at BVA. Still, Jackson assisted LB in her schoolwork, and even prepared and graded extracurricular assignments for LB. For the remainder of the school year, LB spent several days per week, including weekends, at Jackson's apartment, completing her BVA school work while Jackson worked.

Jackson shared her apartment with her fiancé, Ikeem, who began inappropriately touching LB in Jackson's apartment. One day, during a break in the school day, while LB and Jackson were lying in Jackson's bed together, LB told Jackson about the abuse for the first time. In response, Jackson told LB not to tell anyone because if she did, she would not be able to continue coming over to Jackson's apartment. The abuse continued.

After the school year ended and into the summer, LB continued spending time at Jackson's apartment. Jackson continued working as a BSD employee during the summer. On one occasion, while Jackson, Ikeem, and LB prepared to go to the beach, Jackson witnessed Ikeem touching LB's breasts while LB sat on his lap. In response, Jackson blamed LB, suggesting that LB had a crush on Ikeem. Later that day, Jackson asked LB if Ikeem was continuing to touch her inappropriately and LB responded affirmatively, further disclosing that

Ikeem forced LB to touch him. Jackson also confronted Ikeem. Ikeem cried because he was afraid he would be imprisoned, and Jackson comforted him in front of LB.

On other occasions, LB told Jackson that Ikeem was touching her inappropriately.

In the fall, LB began attending school in person, at a different school within BSD. She continued visiting Jackson's apartment. In October 2021, Ikeem raped LB multiple times at the apartment. LB reported the abuse to Satterwhite, who took her to the hospital.

In November 2022, Ikeem pleaded guilty to rape of a child in the first degree. One month later, Satterwhite, on behalf of herself and LB, filed this lawsuit against BSD for negligence and failure to report abuse pursuant to ch. 26.44 RCW as well as outrage. BSD moved for summary judgment, but the trial court denied the motion.

## II. TRIAL

### A. Motions in Limine

Prior to trial, the trial court granted the following motions in limine raised by Satterwhite:

22. The court should exclude any statement, argument, or insinuation regarding the lack of criminal charges or convictions for Eunissa Jackson.
   . . . .
23. Defendant should be precluded from referencing or insinuating that no criminal charges were filed against Eunissa Jackson for failing to act as a mandatory reporter.
   . . . .
51. Legal argument or statements of law before the court has instructed the jury must be prohibited.

Clerk's Papers (CP) at 1706, 1712 (boldface and capitalization omitted). Regarding motions in limine raised by BSD, the trial court reserved ruling on whether legal conclusions from Dr. Smith would be admissible but granted a motion stating that "the ultimate opinions offered by

4

[Satterwhite's] experts . . . [Dr.] Smith are an issue for the jury to determine." CP at 1729 (boldface and capitalization omitted).

Without objection, Satterwhite offered proposed exhibits 1 and 2. Proposed exhibit 1, a section taken from BSD's policy manual, stated, in relevant part, "staff are free from liability for reporting instances of abuse or neglect and professional staff are criminally liable for failure to do so." Ex. 1, at PDF 10. Proposed exhibit 2, also a section taken from BSD's policy manual, describes the process mandatory reporters must follow when making a report, and states, "Any school staff member who, in good faith, reports such suspected abuse or neglect shall be immune from civil or criminal liability." Ex. 2, at PDF 13. The trial court admitted exhibits 1 and 2.

B.      Opening Statements

During opening statements, BSD informed the jury that when Jackson chose not to report LB's abuse, she knew she was acting contrary to her mandatory reporting duty:

> [Y]ou will hear from Ms. Jackson as well. And she will testify, "Yes, I knew I was a mandatory reporter. Yes, I knew that I did not get to clock off from being a mandatory reporter. Yes, I knew my mandatory reporting duties included family members. Yes, I knew it applied to the [BVA]." She knew from the training that she had received in [BSD] exactly what she was supposed to do with that information. And, again, not only did she not do what she was supposed to do, she actively attempted to silence her sister in the interest of protecting her boyfriend.

3 Rep. of Proc. (RP) at 434-35.

BSD also stated,

> This is a case of an intentional decision made by an employee outside the course and scope of her employment to protect her boyfriend from going to jail. And her intentional acts in trying to silence her sister are as heinous as the acts of Ikeem Jackson, because she perpetuated and allowed that abuse to continue.
> And we'll talk about the fact that Ms.—I'll rephrase that.
> The evidence in the case will be that when Ms. Jackson made that intentional, conscious decision to try to silence her younger sister, she was acting

contrary to the interests and the expectations and the demands of Bethel School District.

3 RP at 427-28. After BSD concluded its opening statement, Satterwhite requested a curative instruction for BSD's alleged violation of a motion in limine. Satterwhite stated that she chose not to object during BSD's opening statement because she did not "want the jury to hold it against me for interrupting, because it's generally considered impolite." 3 RP at 449. The trial court agreed to give a curative instruction and notified Satterwhite that she should raise objections when they occur instead of waiting until later.

The trial court instructed the jury, "the lawyers' statements are not evidence or the law," and further instructed that the law was contained in the trial court's instructions which would be provided to the jury at the end of the presentation of evidence. 3 RP at 465.

C.     Testimony of Dr. Dennis Smith

Prior to Dr. Smith's testimony, BSD sought clarification of the trial court's rulings limiting evidence of criminality—specifically as to motions in limine 22 and 23. BSD stated it would not ask about "whether or not Eunissa Jackson was or was not charged for failing to report abuse." 3 RP at 456. Instead, BSD sought to ask Dr. Smith whether he was aware that BSD

6

trained its teachers that there are criminal ramifications for not reporting, mentioning RCW 26.44.020 and .030,[2] and "stopping there." 3 RP at 457.

The trial court clarified that, while it was "a fine line that [BSD was] walking," the trial court was maintaining its ruling on the motion in limine to prohibit "specifically mentioning . . . any criminal liability or criminal charges or lack thereof of [Eunissa] Jackson." 3 RP at 463. However, it would allow "a question about the witness's understanding of [BSD's] policy and procedure" broadly and without "zero[ing] in on one particular person or any person in particular." 3 RP at 463-64.

Dr. Smith trained principals, teachers, and superintendents, on leadership and strategy, along with consulting on education-related cases across the country. During Dr. Smith's testimony, he clarified that as a mandatory reporter, "your reporting duties are 24/7. It doesn't matter if you learn of this on the playground, the weekend, or wherever the case might be. By law, you're required to make that report." 3 RP at 514.

Then, the following exchanges occurred:

[BSD]: The response of Ms. Jackson to L.B. in telling her "Don't tell anyone or you will never be able to come over here again"—that's contrary to the training she received from [BSD], is it not?

[Dr. Smith]: Yes.

---

[2] RCW 26.44.020 provided definitions for chapter 26.44 RCW, "Abuse of Children," including the meaning of "professional school personnel." Former RCW 26.44.020(23) (2023). Within the chapter, section .030 provides, among other things, that professional school personnel who have reasonable cause to believe that a child has suffered abuse or neglect must report the incident, or cause a report to be made, to proper law enforcement or the department of children, youth, and families. Former RCW 26.44.030(1)(a) (2023); *see* Former RCW 26.44.020(10) (2023). A later provision in the chapter, RCW 26.44.080, provides that a person who is required to make, or cause to be made, a report and knowingly fails to do so is guilty of a gross misdemeanor.

[BSD]:          Ms. Jackson telling L.B. "Don't tell anyone or you can't come over here. You won't be able to come over here anymore" was contrary to the [BSD]'s policy 3421, was it not?

[Dr. Smith]:    Yes.

. . . .

[BSD]:          Ms. Jackson telling L.B. "Don't tell anyone about the abuse or you won't be able to come over here again" was contrary to the mission statement of [BSD], was it not?

[Dr. Smith]:    . . . I would just say, as I've said before, [Jackson] failed in her duties to report the abuse. . . .

[BSD]:          When Ms. Jackson told L.B. "Don't tell anyone about the abuse or you won't be able to come over here again," she was acting contrary to the most fundamental and sacred job duty and responsibility that [BSD] had of her?

[Dr. Smith]:    Of any school district.

[BSD]:          When Ms. Jackson tried to blame L.B. for the sexual abuse, telling her it was her fault because she wanted to be [Ikeem's girlfriend], Ms. Jackson acted directly contrary to [BSD's] training that it provided her?

[Dr. Smith]:    I would just say that it was inappropriate for a teacher to do that, to say that. I'm not—it's just clearly not something that a mandatory reporter would do.

. . . .

[BSD]:          Regardless of when it was that Eunissa Jackson said to L.B., "Don't tell anyone about the abuse or you won't be able to come over here," that was in direct violation of [BSD]'s expectations and interests? Would you agree with me?

[Dr. Smith]:    I don't—it's in violation of the statutes. It's contrary to the school policies. I'm not sure what's in anybody—I mean, the best interests—that's really for the school district to determine. But it was clearly not in compliance with the statutes. It was not in compliance with board policy.

[BSD]:          Are you not agreeing with me that it is in the interest of [BSD] to protect its students?

[Dr. Smith]:    Certainly.

[BSD]:          All right. Then if a teacher does something that thwarts or acts contrary to the protection and safety of students—teacher's acting contrary to the interest of [BSD]; yes?

[Dr. Smith]:    Well, I mean they're working outside the—*they're acting outside the scope of their job responsibilities as a teacher*.

3 RP at 558-59, 564-65 (emphasis added). Satterwhite did not object during these exchanges.

8

On the next trial day, Satterwhite sought to limit Dr. Smith's trial testimony regarding the scope of Jackson's job responsibilities. Satterwhite, in reviewing Dr. Smith's deposition transcript, noticed that Dr. Smith used the phrase "'outside the scope of job responsibilities.'" 4 RP at 579. Satterwhite believed that this phrase constituted a "legal conclusion" contrary to ER 704.[3] 4 RP at 579-80.

When the trial court asked Satterwhite what she was asking the trial court to do, Satterwhite responded, "So the only request we make of the Court is that no questions be made of Dr. Smith or any other witness about that specific line of testimony." 4 RP at 580. Satterwhite did not argue that anything should be done with Dr. Smith's prior trial testimony and requested that BSD be restricted from specifically questioning witnesses using the phrase "scope of employment." 4 RP at 585. Ultimately, the trial court reserved ruling on the issue, stated that it was unpersuaded by Satterwhite's argument, and invited Satterwhite to object to specific future testimony.

Soon after, BSD asked Dr. Smith the following:

Do you recall on Thursday I asked you whether or not [Eunissa] Jackson was acting contrary to the interests of [BSD] when she victim-blamed her sister, threatened her sister, and tried to guilt her sister about the abuse and you responded she was acting outside the scope of her job responsibilities?

4 RP at 595. Satterwhite objected. The trial court overruled the objection because BSD's question went to Dr. Smith's own statement, not a statement of BSD's counsel.

Dr. Smith responded:

I do, because I reflected on this. I believe I do recall that. But I misspoke if that was the case, because "scope of employment" is a legal definition, if you will. And

---

[3] ER 704 provides, "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

I can't opine on that, and I think the judge would be the one that would ultimately render some instructions to the jury on it. So if I said that, and then I—I misspoke on that.

4 RP at 596. BSD asked again, "do you remember testifying on Thursday that [Eunissa] Jackson was acting outside the scope of her job responsibilities?" 4 RP at 596. Satterwhite again objected, this time arguing that the question was asked and answered, but the trial court overruled the objection. Dr. Smith answered that he remembered testifying that Jackson had been acting outside the scope of her job responsibilities.

Then, the following exchange occurred:

[BSD]: Assuming that L.B.'s testimony is that Ms. Jackson attempted to silence her, to guilt her, and to blame her for the abuse, Ms. Jackson would not have been fulfilling any of her job duties in taking those actions; correct?

[Dr. Smith]: Correct.

[BSD]: And assuming that Ms. Jackson took those actions, she was not fulfilling any of her job responsibilities, was she?

. . . .

[Dr. Smith]: Yeah. She was engaged in her duties, but she wasn't performing those duties.

[BSD]: . . . she was not acting in furtherance of her job responsibilities, was she?

[Dr. Smith]: I don't believe so.

[BSD]: And assuming that I've accurately summarized L.B.'s [deposition] testimony, Ms. Jackson was not fulfilling or furthering her job expectations, was she?

. . .

[Dr. Smith]: I don't believe she would—was doing that.

[BSD]: And, in fact, sir, if Ms. Jackson tried to guilt her sister, tried to silence her sister, and tried to blame her sister for her sister's abuse, Ms. Jackson would be acting contrary to her job duties, responsibilities, and expectations, wouldn't she?

[Dr. Smith]: Yes. Just as when she didn't report the abuse.

4 RP at 598-99. Satterwhite did not object.

Dr. Smith confirmed he had reviewed BSD's mandatory reporting policy and training. BSD then asked whether the policy and training informed employees "that it's actually criminal to not report suspected child abuse." 4 RP at 600. Satterwhite objected, and the trial court overruled the objection. Dr. Smith confirmed that the policy and the training informed employees that failure to report child abuse could lead to criminal liability. Satterwhite did not object.

D.      Exhibit 108

During the testimony of Sara Shobe, the principal of BVA, BSD offered proposed exhibit 18, slides from a training to BVA teachers titled, "What Every Employee Must Be Told." 5 RP at 793 (Ex. 108). Satterwhite objected, arguing, among other things, that the proposed exhibit violated the trial court's order granting motions in limine numbers 22 and 23. The trial court overruled Satterwhite's objection, concluding, among other things, that neither motion in limine number 22 nor 23 were applicable.

Exhibit 108 consisted of slides discussing various responsibilities of school employees. Eight slides discussed school employees' reporting responsibilities for child abuse. One slide stated, "All school district employees—classified and certificated—are required by law to report suspected child abuse, regardless of the perceived source of abuse." Ex. 108, at PDF 323 (boldface omitted). Another stated that an employee who fails to report alleged abuse by an employee "violates state statute and is subject to discipline up to and including dismissal." Ex. 108, at PDF 324 (boldface omitted).

None of the slides regarding child abuse reporting referred to the criminal consequences of not reporting. Two slides mentioned other crimes. One slide stated that the termination of

school district employees was required by law if an employee pleaded to or was convicted of "a felony crime against children or attempts, conspiracies, or solicitations to commit a felony crime against a child." Ex. 108, at PDF 319 (boldface omitted). The other defined "[f]elony [c]rimes against children," but none of the crimes listed included failure to report child abuse. Ex. 108, at PDF 319.

E.      Jackson's Testimony

Later, Jackson testified that as a BSD employee, she had undergone multiple trainings regarding mandatory reporting. Jackson testified that during the 2021 school year, she knew she was a mandatory reporter:

| [BSD]: | During the 2021 school year, was it your understanding that you were a mandatory reporter or not? |
|---|---|
| [Jackson]: | Yes. |
| [BSD]: | What did you understand to be your duties as a mandatory reporter? |
| [Jackson]: | As a mandatory reporter, I'm expected to report any suspicions or anything like that of abuse or neglect. |
| [BSD]: | And did you have that understanding because you were trained on that from [BSD]? |
| [Jackson]: | Yes. |
| [BSD]: | And what was your understanding as to your duties to mandatory report as it relates to teaching in a brick-and-mortar building versus teaching in a virtual setting? |
| [Jackson]: | My understanding is that it's the same. |
| . . . . | |
| [BSD]: | Back in the 2020/2021 time frame, what was your understanding as to when it was that you had to make mandatory reports? |
| [Jackson]: | It was my understanding that if I became suspicious of it, I was to report it. |
| [BSD]: | And did it depend on how you learned about the abuse? |
| [Jackson]: | No. |
| [BSD]: | Did it depend on where you learned about the abuse? |
| [Jackson]: | No. |
| [BSD]: | Was there any question in your mind during the 2020/2021 school year that you were obligated to make a report of child abuse if you suspected it? |
| [Jackson]: | No. |

> [BSD]: And does that include reports that come to you outside of school hours?
>
> [Jackson]: Yes.
>
> [BSD]: And did it include reports that came to you off of school grounds?
>
> [Jackson]: Yes.

10 RP at 1641-43.

F.    Jury Instructions

At the jury instruction hearing, the parties discussed BSD's proposed jury instruction regarding the scope of a mandatory reporter's duty to report abuse under RCW 26.44.030(1)(a). BSD's proposed instruction read, "A mandatory reporter's duty to report suspected child abuse to the proper authorities requires some connection between the individual's professional identity and the circumstances in which the mandatory reporter gained reasonable cause to believe that a child has been abused." CP at 1777. In support of its proposed instruction, BSD cited *State v. James-Buhl*, 190 Wn.2d 470, 477, 415 P.3d 234 (2018).

Satterwhite objected to the proposed instruction, arguing that *James-Buhl*, a criminal case, was inapplicable to the present case both because of its criminal nature and because of its distinct facts. Satterwhite argued the instruction would be "misleading and prejudicial for the jury's consideration." 11 RP at 1722.

In response, BSD argued the reasoning from *James-Buhl* applied because *James-Buhl* required that for a mandatory reporter's duty to report to exist, there must be a connection between a mandatory reporter's professional status and the circumstances from which the reporter learns of abuse. BSD further argued the instruction was necessary because if Jackson did not have a duty to report, then that would support BSD's defense theory that BSD was not vicariously liable. BSD argued that even though the jury had heard testimony asserting that the

13

duty to report abuse was unqualified, that testimony simply supported the conclusion that the duty to report may have been constant according to the training received by BSD employees— not according to the law.

The trial court ruled that the reasoning in *James-Buhl* applied in the civil context. Further, the trial court ruled that the instruction would not be prejudicial to either party because while BSD could argue that there was an insufficient connection between Jackson's professional role and the circumstances in which she learned of LB's abuse, Satterwhite could argue the opposite. The trial court determined it would include the instruction and numbered it as jury instruction 18.

The trial court also gave jury instruction 5, a summary of the parties' arguments:

> The Plaintiffs claim that the Defendant [BSD] was negligent in one or more of the following respects:
> - Failing to make a mandatory report regarding Plaintiff L.B. and Ikeem Jackson;
> - Failing to provide adequate training to its employees;
> - Failing to provide reasonable monitoring and oversight of Plaintiff L.B.'s virtual learning setting;
> - Failing to adequately communicate with Plaintiff L.B. regarding her virtual learning setting;
> - Failing to adequately communicate with employee Eunissa [Jackson] regarding Plaintiff L.B.'s virtual learning setting;
> - Failing to follow alternative learning experience (ALE) standards of care; and
> - Failing to provide reasonable protection for Plaintiff L.B. in her virtual learning setting.
>
> . . . .
>
> [BSD] denies that it is vicariously liable for Eunissa Jackson's response to L.B.'s reports of abuse. [BSD] alleges that Ms. Jackson acted outside the course and scope of her employment.
>
> [BSD] likewise denies that it was in any manner negligent and instead alleges that it acted reasonably and consistent with the standard of care.

CP at 2529.

14

Jury instruction 7 provided,

> Negligence is the failure to exercise ordinary care. It is the doing of some act that a reasonably careful person and/or school district would not do under the same or similar circumstances or the failure to do some act that a reasonably careful person and/or school district would have done under the same or similar circumstances.
>
> Ordinary care means the care a reasonably careful person and/or school district would exercise under the same or similar circumstances.

CP at 2532.

Jury instruction 8 stated, "School Districts have a duty to exercise reasonable care to protect students in their custody from reasonably foreseeable harm. This includes the duty to anticipate dangers which may reasonably be anticipated, including reasonably anticipated dangers posed by the intentional or criminal acts of third parties." CP at 2533. Satterwhite did not object to this instruction.

Jury instruction 12 stated,

> One of the issues for you to decide is whether Eunissa Jackson was acting within the scope of authority.
>
> An agent is acting within the scope of authority if the agent is performing duties that were expressly or impliedly assigned to the agent by the principal or that were expressly or impliedly required by the contract of employment. Likewise, an agent is acting within the scope of authority if the agent is engaged in the furtherance of the principal's interests.
>
> Defendant [BSD] does not dispute that all other employees in this case were agents acting within the scope of authority.

CP at 2537. Satterwhite proposed that the trial court give this instruction as long as it contained the last paragraph and did not object to giving the instruction. CP at 2180-81.

Jury instruction 13 stated, "Any act or omission of an agent within the scope of authority is the act or omission of the principal. This is referred to as vicarious liability." CP at 2538.

15

Jury instruction 14 stated, "A school district can be vicariously liable for its employee's negligent failure to report child abuse." CP at 2539.

Finally, as noted above, the trial court gave jury instruction 18, which stated, "A mandatory reporter's duty to report suspected child abuse to the proper authorities requires some connection between the individual's professional identity and the circumstances in which the mandatory reporter gained reasonable cause to believe that a child has been abused." CP at 2543.

G.     Closing Arguments

Before the parties presented closing arguments or the trial court provided the jury with instructions, the trial court received an email. The email purported to be from someone who had overheard one of the jurors stating that they were "pissed at the length of time" the trial had taken and that "as soon as they get the case to deliberate, they have already made up their minds and won't take long to render a verdict." 12 RP at 1774. The trial court expressed concern and asked both parties if they wished to question the juror identified in the email. Both Satterwhite and BSD declined to take any further action or question the juror.

During closing arguments, BSD reminded the jury that in its opening statements, it had said

> when Eunissa Jackson attempted to silence her sister in order to cover up the sexual abuse being committed by her then-boyfriend and the father of her first child, Ms. Jackson was acting outside the course and scope of her employment. I told you the evidence would prove that in victim-blaming, guilting, and threatening her sister, Ms. Jackson acted directly contrary to the interests of Bethel School District and directly contrary to her job duties and expectations.

16

12 RP at 1836. BSD stressed Dr. Smith's testimony, wherein he had testified that at the time Jackson discouraged LB from reporting the abuse, Jackson had not been acting within the scope of employment.

Later, while discussing jury instruction 18, BSD argued,

> So ask yourself: What was the connection between Ms. Jackson's professional identity as a teacher with [BSD] and the circumstances of her learning about this abuse? . . . . Was L.B. spending the night at Eunissa's apartment because Ms. Jackson was her teacher or because Ms. Jackson is her sister?
> Ask yourself: Was L.B. spending almost every weekend over at Ms. Jackson's apartment because Ms. Jackson was her teacher or Ms. Jackson is her sister? . . . . Was L.B. lying in Ms. Jackson's bed in her bedroom when L.B. made the first report of abuse because Ms. Jackson was her teacher or because Ms. Jackson is her sister?
> Ask yourself: Was L.B. going on that family outing to the beach . . . when the second disclosure came in the middle of the summer because Ms. Jackson was her teacher or because Ms. Jackson was her sister?

12 RP at 1849-50.

Additionally, while discussing instruction 14, BSD argued that although a school district could sometimes be vicariously liable for its agents' negligent failure to report child abuse,

> what Ms. Jackson did was anything but negligent. It was intentional. This is not a case about whether Ms. Jackson failed to exercise ordinary care. It's a case about Ms. Jackson choosing her then-boyfriend over her sister.
> . . . .
> This is not a case where a mandatory reporter sees a child who has bruises on the child and doesn't think to himself or herself "Oh, that might be a sign of abuse" and, therefore, doesn't report it. It's likewise not a case where a teacher receives something that maybe could be interpreted as a disclosure of abuse, maybe not, and errs on the side of not and doesn't report it.
> This is a case involving a direct and explicit report of abuse and the conscious, knowing, and intentional decision to abandon job duties and step aside from job expectations and job requirements and not report the abuse.

12 RP at 1852-53.

The jury returned a verdict finding that BSD was not negligent.

### III. POST-TRIAL

After trial, Satterwhite moved for vacation of the verdict and a new trial under CR 59. Satterwhite argued that BSD had been "allowed to severely misrepresent the law to the jury through improper argument and introduction of evidence and testimony." CP at 2613. Satterwhite alleged that BSD violated the court's order on motions in limine numbers 22 and 23, improperly described Jackson's conduct as "intentional" in opening statements, improperly referenced exhibits 1 and 2 in unredacted format, improperly questioned Dr. Smith about the criminal consequences of failing to report abuse that were contained within BSD's training and policy materials, and improperly argued in closing that Jackson had acted intentionally and outside the scope of BSD's authority. CP at 2614. The motion also mentioned the email received by the trial court regarding the fact that one juror had apparently made up their mind before closing.

BSD responded to the motion, and the trial court heard oral arguments. The trial court denied the motion.

Satterwhite appeals.

### ANALYSIS

#### I. LEGAL BACKGROUND

To prove negligence, a plaintiff must demonstrate (1) a legal duty; (2) breach of that duty; (3) causation; and (4) injury. *See, e.g., Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 287, 481 P.3d 1084 (2021).

If an employee is acting within the scope of their employment, then an employer is "vicariously liable under the principles of the law of Agency." *Anderson v. Soap Lake Sch. Dist.,*

191 Wn.2d 243, 361, 423 P.3d 197 (2018) (quoting RESTATEMENT (SECOND) of Torts § 317 cmt. a (1965)).

> An employee is within the scope of employment if he or she is (1) engaged in the performance of duties required by his employment contract or specifically directed by the employer—i.e., fulfilling his or her job functions, or (2) engaged in the furtherance of the employer's interests. In applying this test, we focus on the benefit to the employer of the employee's liability-causing conduct.

*Evans v. Tacoma School Dist. No. 10*, 195 Wn. App. 25, 37, 380 P.3d 553 (2016) (internal citations omitted).

An employee's conduct is outside the scope of employment if it is not done in furtherance of the employer's business. *Id.* Thus, "'[w]here the employee steps aside from the employer's purposes in order to pursue a personal objective of the employee, the employer is not vicariously liable.'" *Id.* (quoting *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 48, 929 P.2d 420 (1997)).

School districts have "an enhanced and solemn duty" of reasonable care to protect their students, including protecting their students from foreseeable risk of harms their students may inflict on each other. *N.L. v Bethel Sch. Dist.*, 186 Wn.2d 422, 430, 378 P.3d 162 (2016)) (quoting *Christensen v. Royal Sch. Dist. No. 160*, 156 Wn.2d 62, 67, 124 P.3d 283 (2005). "School districts have the duty 'to exercise such care as an ordinarily responsible and prudent person would exercise under the same or similar circumstances.'" *Id.* (quoting *Briscoe v. Sch. Dist. No. 123, Grays Harbor County*, 32 Wn.2d 353, 362, 210 P.2d 697 (1949); *see also Hendrickson v. Moses Lake Sch. Dist.*, 192 Wn.2d 269, 274, 428 P.3d 1197 (2018) ("A school district is held to a standard of ordinary care, not heightened care").

Washington's mandatory reporting law requires that when there is "reasonable cause to believe that a child has suffered abuse or neglect," "professional school personnel" "shall report such incident, or cause a report to be made," to law enforcement. Former RCW 26.44.030(1)(a) (2023). "Professional school personnel" includes teachers. Former RCW 26.44.020(24) (2023). Thus, teachers are mandatory reporters. *See State v. James-Buhl*, 190 Wn.2d at 475.

## II. JURY INSTRUCTIONS

Regarding jury instructions, Satterwhite assigns error solely to the trial court's decision to give jury instruction 18, regarding the scope of a mandatory reporter's duty to report suspected abuse. However, in her briefing, she also calls into question jury instructions 8 and 12. Even though Satterwhite does not assign error to the trial court's decision to give instructions 8 and 12, we will briefly address those instructions as well as instruction 18.

A.    Legal Principles

We review a trial court's decision to give a particular jury instruction for abuse of discretion. *Wright v. 3M Co.*, 1 Wn.3d 795, 805, 533 P.3d 113 (2023). "An instruction may be legally accurate yet not given because it is misleading. However whether an instruction which accurately states the law should not be given to avoid confusion is a matter within trial court discretion, not to be disturbed absent abuse." *Griffin v. RS, Inc.*, 143 Wn.2d 81, 90-91, 18 P.3d 558 (2001) (internal citations omitted).

A trial court's decision whether to give a certain jury instruction is highly fact-specific because every case presents different facts and thus, there is no universal formula. *Wright*, 1 Wn.3d at 805. If a party's theory of the case is supported by substantial evidence, then a jury instruction on that theory is required. *Id.* Substantial evidence means evidence rising "'above

speculation and conjecture.'" *Id.* (quoting *Bd. of Regents v. Frederick & Nelson*, 90 Wn.2d 82, 86, 579 P.2d 346 (1978)). To be sufficient, jury instructions must allow each party to argue their case theory, must not be misleading, and must, when read as a whole, "'properly inform the trier of fact of the applicable law.'" *Hendrickson*, 192 Wn.2d at 280 (quoting *Anfinson v. FedEx Ground Package Sys., Inc.,* 174 Wn.2d 851, 860, 281 P.3d 289 (2012)).

When a party challenges the legal basis of a jury instruction, we review the instruction de novo. *Hendrickson*, 192 Wn.2d at 274. "Even if an instruction is misleading, and therefore erroneous, it will not require reversal unless prejudice is shown." *Goodman v. Boeing Co.*, 75 Wn. App. 60, 68, 877 P.2d 703 (1994). Any error is harmless "unless it affects or presumptively affects the outcome of the trial." *Id.* at 68. *See also Alston v. Blythe*, 88 Wn. App. 26, 35 n.23, 943 P.2d 692 (1997) (stating that such error is harmless unless there is a reasonable likelihood the outcome of the trial would have been different without it). As the challenger of the instruction, Satterwhite bears the burden of showing prejudice. *Fergen v. Sestero*, 182 Wn.2d 794, 803, 346 P.3d 708 (2015).

If a party fails to object to a jury instruction, they waive the ability to challenge that instruction on appeal. *Hudson v. United Parcel Serv., Inc.*, 163 Wn. App. 254, 269, 258 P.3d 87 (2011). Further, a party cannot appeal a trial court's failure to give a particular instruction if the party did not propose such an instruction. *Goodman v. Boeing Co.*, 75 Wn. App. 60, 75, 877 P.2d 703 (1994).

B. Jury Instruction 8

Satterwhite emphasizes that BSD owed LB a duty of care. The existence of that duty was uncontested, as instruction 8 establishes.

21

Nevertheless, Satterwhite argues that instruction 8 fails to make clear that this duty is a basis of liability that is separate from vicarious liability. However, Satterwhite did not propose such an amendment to instruction 8, and in fact, she did not object to instruction 8 at all. Therefore, she has waived her challenge to instruction 8 on appeal.

C.     Jury Instruction 12

Satterwhite takes issue with instruction 12 on two grounds. First, she claims the instruction is inadequate because it does not clarify that the jury could find BSD directly liable even if it did not find BSD vicariously liable. But Satterwhite did not propose such an amendment to instruction 8, and she did not object to instruction 12 on this basis. In fact, she proposed the exact language found in instruction 12. Therefore, Satterwhite has waived this challenge.

Second, Satterwhite claims the trial court should not have given instruction 12 at all and instead should have ruled that BSD was vicariously liable as a matter of law. But Satterwhite did not object to the trial court giving this instruction. Therefore, Satterwhite has waived this challenge.[4]

D.     Jury Instruction 18

Satterwhite argues the trial court erred by giving jury instruction 18 because it related to whether Jackson had a duty to report, which was not contested at trial. We conclude that even if

---

[4] Satterwhite contends in her reply brief that she raised this issue to the trial court below in response to BSD's motion for summary judgment. However, she herself never moved for summary judgment below, and when the trial court denied BSD's motion for summary judgment, Satterwhite did not appeal. Because she did not move for summary judgment on these grounds below, she certainly cannot do so now.

the trial court erred by giving this instruction, any error was harmless because BSD used the

instruction only to argue vicarious liability and the instruction did not prevent Satterwhite from

arguing her theory of the case.[5]

In *James-Buhl*, the defendant, a teacher, was charged with failure to comply with the

mandatory reporting statute. 190 Wn.2d at 471; RCW 26.44.030(1)(a). The trial court dismissed

the charges, determining the mandatory reporting statute did not apply because the victims, who

were the defendant's daughters, were not her students and she learned about the alleged abuse in

her parental role, not as a teacher. *Id.* at 472-73. Our supreme court affirmed the dismissal of

the charges, holding "failure to comply with the mandatory reporting duty . . . requires some

connection between the individual's professional identity and the criminal offense." *Id.* at 478.

Further, the Court concluded "[t]he mandatory reporting law does not impose an unlimited, ever

present duty because it refers to people by means of their occupation, not simply as adults or

persons." *Id.* at 478-79.

Instruction 18 read, "A mandatory reporter's duty to report suspected child abuse to the

proper authorities requires some connection between the individual's professional identity and

---

[5] Satterwhite relies on the federal western district court's order, *Sanchez v. Aberdeen Sch. Dist. No. 5*, 2023 WL 1781499 (W.D. Wash. 2023) (court order). But *Sanchez* is inapposite. In that case, the defendant school district moved for summary judgment, arguing that under *James-Buhl*, its employees, who had failed to report suspected abuse under the mandatory reporter statute, had no obligation to report because of the circumstances under which they learned about the abuse. *Sanchez* at *5. The court concluded that the plaintiffs had pointed to sufficient issues of fact such that the court denied the motion for summary judgment, requiring the matter to proceed to trial. *Sanchez* at *6. Here, the matter proceeded to trial and by providing the jury with instruction 18, the trial court did not decide whether Jackson had a duty to report LB's abuse—if anything, the trial court left that determination to the jury. Further, we are not bound by federal court decisions. *Nguyen v. Quality Loan Serv. Corp.*, 33 Wn. App. 2d 602, 606, 562 P.3d 384 (2025). Thus, this argument is unavailing.

the circumstances in which the mandatory reporter gained reasonable cause to believe that a child has been abused." CP at 2543. Thus, instruction 18 is not a misstatement of the law, as it pertains to a mandatory reporter's duty to report under the reporting statute.

The question here is whether the trial court abused its discretion by giving instruction 18 when Jackson's duty to report LB's abuse was not at issue below. Even if we assume without deciding it was error for the trial court to give the instruction, doing so was harmless.

Both Satterwhite's and BSD's witnesses agreed that a mandatory reporter in Jackson's circumstances had a duty to report LB's abuse. This evidence was also found in BSD's policies and procedures. However, one of the central disputes throughout the trial was the extent to which Jackson acted as LB's sister or as her teacher, and whether that distinction placed her actions outside the scope of BSD's authority. BSD did not argue to the jury that Jackson had no duty to report. To the contrary, BSD argued that Jackson's intentional decision to disregard her known duty to report placed her outside the scope of BSD's authority. Additionally, BSD used instruction 18 fleetingly in its closing arguments and with the apparent purpose of arguing to the jury that Jackson's relationship to LB, when she disregarded her duty to report, placed her outside the scope of BSD's authority.

Moreover, the trial court's decision to give instruction 18 did not prevent Satterwhite from advancing her vicarious liability theory. Satterwhite thoroughly argued her theory that Jackson was acting within the scope of BSD's authority by presenting evidence of LB's school workspace at Jackson's apartment, Jackson's communications with LB's teacher, and the extracurricular academic help LB received from Jackson, as well as the fact that Jackson worked from her apartment, often in very close proximity to LB. The witnesses agreed that Jackson had

24

a duty to report LB's abuse, and we agree with Satterwhite that proving Jackson had a duty to report was "a *low bar* and it was plainly met here." Br. of Appellant at 44. Here, Satterwhite, as the party opposing instruction 18, was able to lessen any potential prejudice by explaining her position.

In sum, Satterwhite bore the burden of proving that Jackson acted within the scope of BSD's authority, regardless of whether Jackson had a duty to report. And even if we assume the trial court erred by giving instruction 18, BSD only used it to argue vicarious liability. Moreover, it was widely agreed at trial that Jackson had a duty to report LB's abuse. Thus, any error in providing instruction 18 was harmless.[6]

Satterwhite also argues the trial court erred by providing instruction 18 because the instruction failed to clarify that even if Jackson had no duty to report LB's abuse as a mandatory reporter, the jury could still find BSD directly liable "under its overarching special protective relationship" with LB. Br. of Appellant at 46 n.19. We disagree because, considering the jury instructions as a whole, the distinction between Satterwhite's theories of BSD's liability was sufficiently clear.

For instance, jury instruction 5 summarized Satterwhite's seven distinct theories of BSD's alleged negligence. At least six of those theories appear wholly unrelated to vicarious

---

[6] Satterwhite also appears to argue the trial court's decision to give instruction 18 allowed BSD "to offer evidence at trial of L.B. sitting around Jackson's apartment or lying in bed doing work," Br. of Appellant at 45, but that evidence was offered long before the trial court agreed to give instruction 18, and Satterwhite did not timely object to the evidence. *See* 3 RP at 553-54. That evidence supported BSD's theory that Jackson's relationship with LB contributed to her being outside the scope of BSD's authority, and BSD was entitled to argue that theory.

liability. *See* CP at 2529 (where "Failing to make a mandatory report regarding Plaintiff L.B. and Ikeem Jackson" appears to be the only theory involving vicarious liability).

Even if jury instruction 5 failed to highlight the distinction between Satterwhite's theories of direct liability and vicarious liability, the trial court also provided jury instruction 7. Instruction 7 stated that "[n]egligence is the failure to exercise ordinary care," and that "[o]rdinary care means the care a reasonably careful person and/or school district would exercise under the same or similar circumstances." CP at 2532. The instruction specifically noted that school districts, as well as people, owe a duty of care, clarifying for the jury that Satterwhite's theories of BSD's negligence went beyond just vicarious liability. Thus, this argument fails.

Even if the trial court abused its discretion in giving instruction 18, the error was harmless.

## II. DENIAL OF SATTERWHITE'S CR 59 MOTION

Satterwhite argues the trial court abused its discretion by denying her motion for a new trial under CR 59. We disagree.

### A. Legal Principles

CR 59 allows a party to move for vacation of a verdict and a new trial for several reasons "materially affecting the substantial rights" of the party, including the "[m]isconduct of [a] prevailing party." CR 59(a)(2); *Coogan v. Borg-Warner Morse Tec Inc.*, 197 Wn.2d 790, 806, 490 P.3d 200 (2021). If a party's misconduct unfairly exposes the jury to inadmissible evidence and prejudices the other party, then that misconduct has materially affected the other party's right to a fair trial. *Andren v. Dake*, 14 Wn. App. 2d 296, 306, 472 P.3d 1013 (2020).

26

"When evaluating whether a party's misconduct warrants a new trial, courts consider the cumulative effect of all instances of misconduct." *Id.* "The key question is whether 'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.'" *Coogan*, 197 Wn.2d at 806 (quoting *Alum. Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000)). A new trial is warranted, based upon the misconduct of the prevailing party, if "'(1) the conduct complained of is misconduct, (2) the misconduct is prejudicial, (3) the moving party objected to the misconduct at trial, and (4) the misconduct was not cured by the court's instructions.'" *Henderson v. Thompson*, 200 Wn.2d 417, 432 n.5, 518 P.3d 1011 (2022) (quoting *Teter v. Deck*, 174 Wn.2d 207, 226, 274 P.3d 336 (2012)).

"'The trial court is in the best position to most effectively determine if counsel's misconduct prejudiced a party's right to a fair trial.'" *Andren*, 14 Wn. App. 2d at 305 (internal quotation marks omitted) (quoting *Spencer v. Badgley Mullins Turner, PLLC*, 6 Wn. App. 2d 762, 790 432 P.3d 821 (2018)). We afford the position and discretion of the trial court significant deference when considering an appeal for a new trial unless the record clearly demonstrates prejudicial effect. *Coogan*, 187 Wn.2d at 806. Thus, we review a trial court's decision to deny a CR 59 motion for abuse of discretion. *Budd v. Kaiser Gypsum Co., Inc.*, 21 Wn. App. 2d 56, 73, 505 P.3d 120 (2022).

A trial court abuses its discretion when it bases its decision on untenable grounds or reasons or if its decision is manifestly unreasonable. *Teter*, 174 Wn.2d at 222. "A trial court's decision is manifestly unreasonable if it is outside the range of acceptable choices." *Id*.

"A timely objection is one of the requirements for a new trial based on attorney misconduct because it prevents parties from gambling on a favorable verdict before claiming error." *Coogan*, 197 Wn.2d at 808. The only exception to this requirement is appropriate when an attorney's misconduct is so flagrant that it could not be cured by any instruction. *Id.* at 808-09.

B.  The Trial Court Did Not Abuse Its Discretion by Denying Satterwhite's CR 59 Motion

Satterwhite argues BSD committed misconduct in two ways: its "insistence of raising Jackson's 'criminality,'" allegedly in violation of the trial court's order on motions in limine numbers 22 and 23, and its "insistent misstatement of the law on vicarious liability." Br. of Appellant at 48.[7]

1. *Alleged Violation of Order on Motions in Limine Numbers 22 and 23*

Satterwhite first takes issue with comments made during BSD's opening statements. Specifically, she notes BSD's comments that the case was one "of an intentional decision made by an employee outside the course and scope of her employment," where BSD stated that Jackson's attempts to "silence her sister are as heinous as the acts of Ikeem Jackson." 3 RP at 427-28. Satterwhite argues this statement was misconduct because it compared Jackson's behavior with Ikeem's criminal conduct. We disagree.

---

[7] In her opening brief, Satterwhite assigns error to the trial court's denial of her CR 59 motion for a new trial. In her issues pertaining to her assignments of error, she states that this error is based, at least in part, upon alleged juror misconduct. However, because Satterwhite provides no argument on the issue of juror misconduct in her briefing, the issue has been abandoned, and we decline to address it. *See Herdson v. Fortin*, 26 Wn. App. 2d 628, 637 n.3, 530 P.3d 220 (2023) ("An assignment of error not argued in a party's brief is abandoned").

Regardless of whether this opening statement comment was improper, Satterwhite fails to show either that she objected to it or that it was not cured by the trial court's instructions. Satterwhite raised a concern with BSD's statement after the conclusion of its opening statement. Even then, she did not formally object to the statement, and instead, requested that the trial court provide a curative instruction. The trial court did so, reminding the jury that lawyers' remarks are not evidence or the law. Further, in its instructions at the end of trial, the trial court provided the jury with various instructions explaining the concept of vicarious liability and whether an agent is acting within the scope of their employment. Absent a showing to the contrary, we presume that jurors follow the court's instructions. *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 729, 543 P.3d 821 (2024). Thus, because Satterwhite did not timely object to BSD's statement and because the trial court provided the jury with both curative and jury instructions on the issue, Satterwhite fails to show BSD's statements were misconduct upon which a new trial was warranted.

Next, Satterwhite appears to argue BSD committed misconduct by asking Dr. Smith whether BSD's training policies communicated to employees that failing to report child abuse could result in criminal liability. We disagree.

The order on motions in limine numbers 22 and 23 prohibited BSD from mentioning the criminal liability, criminal charges, or lack thereof for Jackson specifically. In clarifying its orders prior to Dr. Smith's testimony, the trial court stated that the parties were allowed to broadly ask "a question about the witness's understanding of [BSD's] policy and procedure" so long as it did not "zero in on one particular person or any person in particular." 3 RP at 463-64.

Here, that is exactly what happened. BSD first asked Dr. Smith whether he was familiar with BSD's training policy and procedure related to mandatory reporting, and Dr. Smith said he was. At that point, BSD asked Dr. Smith whether the BSD policy informed employees, generally, that failure to report abuse could lead to criminal liability. At no point did BSD ask about Jackson's potential criminal liability. Thus, BSD's questioning of Dr. Smith did not conflict with the trial court's order on motions in limine numbers 22 and 23. Further, BSD complied with the trial court's ruling that the parties could broadly ask witnesses about their understanding of BSD's policy and procedure. As a result, Satterwhite fails to show that BSD committed misconduct by questioning Dr. Smith in this way or that the trial court erred in denying the CR 59 motion on these grounds.

Similarly, Satterwhite asserts BSD's counsel committed misconduct through seeking to admit exhibit 108 because the exhibit contained references to criminal violations, contrary to the trial court's order on the motions in limine. We disagree.

Prior to BSD offering exhibit 108, Shobe testified that the exhibit contained presentation slides of a training provided, not just to Jackson, but BVA teachers in general. Significantly, while the slides mentioned some crimes broadly, the crimes mentioned did not include failure to report, the slides that discussed reporting responsibilities did not mention criminal liability at all, and the slides never mentioned Jackson. From these facts, it was not manifestly unreasonable for the trial court to conclude that its order on the motions in limine was inapplicable to the exhibit and that BSD did not commit misconduct by seeking to admit the exhibit. Because exhibit 108 was not in conflict with the trial court's order on motions in limine numbers 22 and 23,

30

Satterwhite fails to show that BSD committed misconduct by seeking to admit the exhibit or that the trial court erred in denying the CR 59 motion on such grounds. [8]

Satterwhite also appears to contest the trial court's decision to allow BSD to reference "unredacted" exhibits, presumably exhibits 1 and 2, because by explaining BSD's mandatory reporter policy, the exhibits mention the possible criminal consequences of failing to report suspected child abuse.[9] Br. of Appellant at 55. For largely the same reasons that the trial court's admission of exhibit 108 complied with the trial court's order on motions in limine numbers 22 and 23, exhibits 1 and 2 also comply. Even though exhibit 1 mentions that failure to report abuse may carry criminal liability, it does not name Jackson. Further, exhibit 2 simply states that personnel who report suspected abuse, in good faith, are immune from liability. Perhaps most significantly, exhibits 1 and 2 were offered by Satterwhite, further undercutting the suggestion that BSD's reference to them was misconduct.

Finally, Satterwhite argues BSD committed misconduct through two statements made during closing arguments which allegedly violated the trail court's order on motions in limine numbers 22 and 23. We disagree. Satterwhite first points to BSD's statement that "Jackson was acting outside the course and scope of her employment." 12 RP at 1836. Next, she points to BSD's statement that "what Ms. Jackson did was anything but negligent. It was intentional. . . .

---

[8] Satterwhite also assigns error to the trial court's decision to admit exhibit 108. However, Satterwhite provides no argument separate from her arguments here. Accordingly, we conclude that Satterwhite has abandoned any issue regarding exhibit 108 separate from the trial court's CR 59 decision. *See Herdson*, 26 Wn. App. 2d at 637 n.3 ("An assignment of error not argued in a party's brief is abandoned").

[9] Exhibit 1, policy 3421, appears to have no redactions and Exhibit 2, policy 3421PR, shows what appears to be a one sentence redaction.

[t]his is a case involving a direct and explicit report of abuse and the conscious, knowing, and intentional decision to abandon job duties and step aside from job expectations and job requirements." 12 RP at 1852-53.

BSD made no reference to any sort of criminal liability against Jackson in either of these statements. Specifically, in its first comment, BSD simply argued Jackson's actions fell outside the scope of employment. This argument does not suggest Jackson acted criminally, and instead, goes directly to BSD's defense theory that it was not vicariously liable for Jackson's actions— actions that were outside the scope of BSD's authority. Similarly, the second statement made by BSD did not suggest that Jackson acted criminally. Instead, BSD argued that while it is possible for a school district to be vicariously liable for its employees' negligent failure to report abuse, here, Jackson's failure to report the abuse was not negligent.

Again, neither of these statements suggested that Jackson committed a crime. Instead, they allowed BSD to argue its defense case theory. Further, Satterwhite did not object to either of these arguments. Finally, as previously mentioned, the trial court had already instructed the jury that lawyers' remarks are not evidence or law, and we presume, absent a showing to the contrary, that jurors follow the court's instructions. Thus, Satterwhite fails to show that these comments, which were consistent with the trial court's order on motions in limine numbers 22 and 23, were misconduct or that they had a clear prejudicial effect on the jury. *Coogan*, 197

32

Wn.2d at 806. Therefore, the trial court did not abuse its discretion by denying Satterwhite's CR 59 motion.[10]

    2.    *Alleged Misstatement of the Law on Vicarious Liability*

Satterwhite argues that BSD engaged in misconduct by misstating the law of vicarious liability by focusing on only one facet of vicarious liability. However, that is not misconduct. The trial court provided the jury with the law on vicarious liability. Thus, counsel may focus on whatever aspects of the law furthers their theory of the case.

### III. DR. DENNIS SMITH'S TESTIMONY

Finally, Satterwhite argues the trial court erred by "requiring Dr. . . . Smith to offer what amounted to a legal opinion on vicarious liability." Br. of Appellant at 60. The alleged testimony Satterwhite challenges on appeal is (1) Dr. Smith's testimony acknowledging that if a teacher acting in a way that thwarted or was contrary to the protection and safety of students, they would be "acting outside the scope of their job responsibilities as a teacher" and (2) BSD's later confirmation with Dr. Smith that he had testified that Jackson's actions were outside the scope of her job responsibilities. 3 RP at 564-65. We disagree.

Washington courts have consistently held that, generally, whether an employee's conduct is within the scope of employment is a *factual* question. *Evans*, 195 Wn. App. at 38; *Henderson v. Pennwalt Corp.*, 41 Wn. App. 547, 552, 704 P.2d 1256 (1985); *Kuehn v. White*, 24 Wn. App.

---

[10] Satterwhite additionally cites to statements made by BSD during arguments on summary judgment, arguments related to proposed jury instructions, and arguments made to the trial court during a colloquy related to Jackson's alleged crime in not reporting LB's abuse. However, these comments were made outside the presence of the jury, and thus, could not have engendered such a feeling of prejudice in the minds of the jury that Satterwhite was deprived of a fair trial. *Coogan*, 197 Wn.2d at 806. Moreover, none of the incidents violated the court's order on motions in limine 22 and 23. We do not address these arguments further.

274 280-81, 600 P.2d 678 (1979); *Sanders v. Day*, 2 Wn. App. 393, 398, 468 P.2d 452 (1970); *Smith v. Leber*, 34 Wn.2d 611, 624, 209 P.2d 297 (1949). And "it has long been recognized that a qualified expert is competent to express an opinion on a proper subject even though he thereby expresses an opinion on the ultimate fact to be found by the trier of fact." *State v. Kirkman*, 159 Wn.2d 918, 929, 155 P.3d 125 (2007); ER 704. "The mere fact that the opinion of an expert covers an issue which the jury has to pass upon, does not call for automatic exclusion." *Id*.

Satterwhite asserts that Dr. Smith's challenged statements concerned inadmissible legal conclusions. BSD points out that Washington courts consider the question of whether a person acts in the course and scope of their employment as a question of fact, relying on *Henderson*, *Kuehn*, and *Sanders*. In response, Satterwhite attempts to distinguish the cases as "old" and not necessarily addressing the admissibility of expert testimony. Reply Br. of Appellant at 22.

Neither distinction changes the fact that Washington courts have long held that whether an employee's conduct is within the scope of employment is a factual question. Notably, Satterwhite does not explain why this general rule should not apply to Dr. Smith's statements nor does she provide any authorities indicating that testimony on whether an employee's conduct is within the scope of employment is a legal conclusion. Where no authorities are cited in support of a proposition, we are not required to search out such authorities "but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962); *see also* RAP 10.3(a)(6).

We hold that Satterwhite fails to show the trial court abused its discretion by permitting the challenged testimony.

No. 59753-5-II

CONCLUSION

We hold that even if the trial court abused its discretion by giving jury instruction 18, doing so was harmless. We further hold the trial court did not abuse its discretion by denying Satterwhite's CR 59 motion, and did not err in allowing Dr. Smith to testify to whether Jackson was acting within the scope of authority.

Accordingly, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Che, J.

We concur:

_____
Price, A.C.J.

_____
Maxa, J.

35